UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PAMELA J. HOKAMP,

                    Plaintiff,                          CASE NO. 21-CV-1125

v.

CHIEF MATTHEW MILLER,
DEPUTY TERI WEGNER,
DEPUTY TOM KLEMKE,
DEPUTY DANIEL HEINRICH,
DEPUTY ERIC HEINE,
DEPUTY SCOTT YAMBOR,
DEPUTY MATT KANTERS,
NURSE AMANDA LENZ, and
NURSE SARAH LUEBKE,

                    Defendants.

**DEPUTY TERI WEGNER, DEPUTY TOM KLEMKE,  DEPUTY DANIEL HEINRICH, DEPUTY ERIC HEINE, DEPUTY SCOTT YAMBOR, DEPUTY MATT KANTERS, NURSE AMANDA LENZ AND NURSE SARAH LUEBKE'S BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Deputy Teri Wegner, Deputy Tom Klemke, Deputy Daniel Heinrich, Deputy Eric Heine, Deputy Scott Yambor, Deputy Matt Kanters, Nurse Amanda Lenz and Nurse Sarah Luebke (the "County Defendants"), by their attorneys, MUNICIPAL LAW & LITIGATION GROUP, S.C., hereby respectfully submit this Brief in Support of their Motion for Summary Judgment.

## **INTRODCUTION**

Pro se Plaintiff Pamela Hokamp ("Hokamp") filed a federal civil rights action arising from her arrest and detention at the Jefferson County Jail ("Jail") on July 22, 2019 involving Village of Lake Mills Police Chief Matthew Miller, several Jefferson County Sheriff's Office deputies (Deputies), and two Jail nurses. (Dkt. #1).  As best as can be discerned by her verbose Complaint

1

which does not enumerate causes of action, she appears to claim false arrest, excessive force, failure to intervene and failure to provide medical care, although in each instance she confusingly fails to identify which defendant she is targeting for which claim. (Dkt. #1). The video and undisputed facts in this case reveal that dismissal is warranted because each defendant acted within the contours of the Fourth Amendment and/or is otherwise entitled to qualified immunity for their actions.

## STANDARD OF REVIEW

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, establish that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A material fact is one that is outcome determinative of an issue with substantive law identifying which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact, and that judgment as a matter of law should be granted to the movant. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Once the moving party has met this burden, the opposing party must go beyond the pleadings and designate the specific facts showing that there is a genuine issue. *Anderson*, 477 U.S. at 248. The mere existence of some alleged factual disputes will not defeat an otherwise properly supported motion for summary judgment. *Id.* at 242. Nor will speculation, hearsay or conclusory allegations suffice to defeat summary judgment. *Gorbitz v. Corvilla, Inc.*, 196 F.3d 879, 882 (7th Cir. 1999). A party opposing summary judgment "must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Ulichny v. Marton Comm. School Dist.*, 249 F.3d 686 (7th

Cir. 2001).  Neither party may rest on mere allegations or denials in the pleadings, or upon conclusory statements contained in any affidavits.  *Anderson*, 477 U.S. at 248.

## ARGUMENT

As noted above, Hokamp's claims are difficult to discern based on her Complaint and various filings with the Court to this point, but she appears to be making claims for false arrest, excessive force, failure to intervene and failure to provide medical care stemming from the events of July 22, 2019.  Each of these causes of action, when reviewed and assessed against the videos, undisputed facts and the rest of the summary judgment record, reveals she does not have viable claims for the reasons as discussed below, including lack of personal involvement and qualified immunity.

In cases where video evidence is available, as here, there are additional contours to summary judgment methodology.  To the extent a party's story "is 'blatantly contradicted' by the video such that no reasonable jury could believe it," courts should not credit that party's version of events.  *Dockery v. Blackburn*, 911 F.3d 458, 461 (7th Cir. 2018) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007).  As the Supreme Court stated, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by [the video and audio evidence], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion….  [A court should instead] "view[] the facts in the light depicted by the videotape."  550 U.S. at 3981.  "When video 'firmly settles a factual issue,' we will not 'indulge stories clearly contradicted by the footage' because there is no genuine factual dispute."  *Smith v. Finkley*, 10 F.4th 725, 730 (7th Cir. 2021) (quoting *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018)).

## I.  HOKAMP'S CLAIMS AGAINST ALL DEFENDANTS REQUIRE DISMISSAL OF CERTAIN DEFENDANTS FOR LACK OF PERSONAL INVOLVMENT.

3

### a. Legal Standards for Personal Involvement

A plaintiff must allege in their complaint that the individual was involved in the constitutional deprivation at issue. Civil rights lawsuits under 42 U.S.C. § 1983 against individuals "require personal involvement in the alleged constitutional deprivation to support a viable claim." *Palmer v. Marion County*, 327 F.3d 588, 594 (2003). Pleading against "all defendants" without any specificity as to who did what, as Hokamp does here, is insufficient to allege the personal involvement necessary to state a claim. Such pleading style heightens the personal involvement deficiency in the Complaint given the separate claims involved in this lawsuit, the number of parties, different locations and span of time. *See Brown v. Ill. Dep't of Public Aid*, 318 F. Supp. 2d 696, 700 (N.D. Ill. 2004) (dismissing a § 1983 claim where plaintiff's "allegations of unequal treatment [were] made generally against all defendants, [and] fail[ed] to allege the element of personal involvement necessary for individual liability under § 1983"). "Each individual defendant can be liable only for what he or she did personally, not for any recklessness on the part of any other defendants, singly or as a group." *Eades v. Thompson*, 823 F.2d 1055, 1063 (7th Cir. 1987). Hokamp shotgun approach to pleading violates this cardinal rule.

### b. Hokamp's False Arrest Claims Against Any County Defendant Must be Dismissed and the False Arrest Claims Otherwise Fail on the Merits.

With regard to any claim of false arrest asserted by Hokamp, the County Defendants lack the requisite personal involvement. Of the County Defendants, only Deputies Heinrich and Klemke were present at the time of her arrest, such that the remaining County Defendants were not involved at all and any false arrest claims against them should be dismissed. Further, Deputies Heinrich and Klemke were present as back-up for Chief Miller, who was the officer placing Hokamp under arrest due to the pending warrants against her. (Undisputed Facts ¶ 5).

4

The County Defendants hereby incorporate Chief Miller's arguments with regard to Hokamp's claims of false arrest. Because there was a facially valid warrant for Hokamp's arrest during the events subject of this lawsuit, as well as a *Heck v. Humphrey* bar, any claim is neither cognizable against Chief Miller or for Deputies Heinrich and Klemke.

### c. Hokamp's Excessive Force Claims Lack Requisite Personal Involvement as to Several Defendants.

Nurse Luebke and Nurse Lenz had no personal involvement in the alleged use of force, and any excessive force claims raised against them must be dismissed for lack of personal involvement.

With regard to the initial physical, hands-on contact with Hokamp prior to the taser deployment, Deputy Heinrich was the only County Defendant involved in such physical contact. (Undisputed Facts ¶ 10). As such, any claims for use of excessive force related to this initial physical contact must be dismissed against all the remaining County Defendants, including Deputy Klemke, whose first use of force did not occur until the taser deployment.

Similar to the initial physical contact with Hokamp, only one County Defendant was involved in the deployment of the taser, that is, Deputy Klemke. (Undisputed Facts ¶ 12). Deputy Klemke deployed the taser, and the taser was only used on one occasion. Any claims for excessive force related to the use of the taser against any County Defendants aside from Deputy Klemke are not cognizable for lack of personal involvement and must be dismissed.

The next use of force involved physically moving Hokamp down to the front walkway and putting her face-down for handcuffing, which occurred after her continued resistance after taser deployment. The only Defendants involved were Chief Miller and Deputies Heinrich and Klemke, such that any claims of excessive force related to such events cannot be brought against the remaining County Defendants. (Undisputed Facts ¶¶ 14-15).

Once at the Jail, the nursing staff was not involved in the removal of Hokamp from the squad car or placement in the restraint chair, such that any excessive force claims against them for such actions are not viable and must be dismissed. Further, Deputies Heinrich and Klemke were the transporting officers only and were not in any physical contact with Hokamp while she was removed from the squad car or placed in the restraint chair – that is, Jail deputies undertook those actions and Deputies Heinrich and Klemke had no personal involvement in that sequence of events. (Declaration Exh. 10 from 11:04:58 – 11:09:11 A.M.; Declaration Exh. 13 from 11:04:58 – 11:09:11 A.M). Hokamp's Complaint makes no specific allegations as to which of the Jail deputy Defendants was involved in removing her from the squad car and placing her in a restraint chair and only broadly alleges "defendants" did this, which is insufficient to present a viable claim for trial. (Dkt. #1, p. 5). Regardless, of any of the remaining Jail deputy Defendants who put her in the restraint chair, even if they were identified, her claim cannot succeed because the use of the restraint chair was justified and they have qualified immunity.

**d. Hokamp Cannot Demonstrate any Actionable Failure to Intervene Claim Against an Individual with Requisite Personal Involvement.**

Hokamp's all-encompassing generalized claims for failure to intervene against all defendants fail the test of personal involvement. They lack any identification of particular persons to particular events and claims and thus lack the requisite personal involvement. It is her burden on summary judgment to connect the dots.

**e. The Inadequate Medical Care Claim Applies only to Nurse Luebke.**

Hokamp acknowledges that her medical care claims are directed only against the nurses, that she only meant to sue one nurse and that Nurse Luebke, not Nurse Lenz, is her target defendant. (Undisputed Facts ¶ 7). As such, any medical care claims against Nurse Lenz, or any other defendant, should also be dismissed for lack of personal involvement.

## II.  HOKAMP'S EXCESSIVE FORCE AND FAILURE TO INTERVENE CLAIMS MUST BE DISMISSED BECAUSE REASONABLE FORCE WAS USED.

Hokamp's claims related to the County Defendants' use of force appear related to the initial physical contact with Hokamp, the deployment of a taser device, her movement to the front walkway and being placed on her stomach for handcuffing, and her placement in a restraint chair at the Jail.  Each of those claims, as discerned by the County Defendants, are addressed in turn below.

The legal standards governing claims of excessive force are analyzed only under the Fourth Amendment.   To the extent her use of force allegations in her Complaint allege violations under other constitutional provisions, they are not cognizable pursuant to *Graham v. Connor*, 490 U.S. 396, 397 (1989).  To the extent she claims the Jail restraint chair was excessive force, those claims should also be analyzed under the Fourth Amendment even if use of a restraint chair can be considered "force."

Claims that law enforcement officers used excessive force during an arrest must be evaluated under the Fourth Amendment "objective reasonableness" standard.   *Acevedo v. Canterbury*, 457 F.3d 721, 724 (7th Cir. 2006).  The question is whether, based on the facts and circumstances known to the officer at the time – and not with the benefit of 20/20 hindsight – the officer acted in an objectively reasonable manner.  *Graham*, 490 U.S. at 396-97.  The amount of force allowed depends on the totality of the circumstances, including, among other things, the severity of the alleged crime, whether the suspect posed a threat to the officers or others, whether the suspect was actively resisting and whether the suspect was attempting to evade arrest.  *Id.*

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Id.*  The calculation of reasonableness must embody allowance for the fact that police officers are forced to make split-second decisions – in

7

circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation. *Id.* "Whether a particular use of force was objectively unreasonable 'is a legal determination rather than a pure question of fact for the jury to decide.'" *Dockery v. Blackburn*, 911 F.3d 458, 464 (7th Cir. 2018) (internal citation omitted).

### a. There Was No Excessive Force During Her Arrest and Detention at the Jail.

In this case, given the circumstances and actions of Hokamp, any use of force at any point in the sequence of events that day did not offend the Fourth Amendment.

#### i. Initial Physical Contact

The initial hands-on with Ms. Hokamp did not violate the Fourth Amendment. In *Outlaw v. Village of Shorewood*, the plaintiff raised excessive force claims related to her arrest and law enforcement officer's use of force by means of grabbing plaintiff's arm while being arrested for a municipal citation related to retail theft. 2021 WL 424224 *1-2 (E.D. Wis. 2021). There, the officer gave the plaintiff the opportunity to comply with citations and even avoid arrest, but she refused and when the officer grabbed plaintiff's arm to arrest her, plaintiff pulled away and a scuffle ensued as plaintiff tried to escape the officer. *Id.* The officer used a takedown maneuver after plaintiff's mother become involved in the scuffle, and eventually compliance was secured. *Id.* at *2. The court noted that it made no difference that plaintiff was charged with a non-criminal ordinance violation because law enforcement officers "may arrest a person for even the most minor offenses" and "[w]hen an officer has probable cause to arrest a person, there is nothing excessive about the officer grabbing that person to affect the arrest." *Id*. at *4. Under the totality of the circumstances, the officer's actions were reasonable under the Fourth Amendment. *Id*. at 5.

Although Deputies Heinrich and Klemke did not carry out the arrest of Hokamp, Chief Miller did so based on a lawful arrest warrant. When a law enforcement officer determines there

is probable cause for an arrest, there is nothing excessive about that officer grabbing that person to effect that arrest. *See Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.").

Here, Hokamp had active and valid warrants for her arrest, which were verified by Chief Miller and which he sought to execute. (Undisputed Facts ¶¶ 4, 5, 8). Hokamp was informed of these warrants by Chief Miller and advised she was under arrest, yet she refused to comply with Chief Miller's order to not resist. Instead, Hokamp reached for the door handle to the house and opened the door with the intention of entering the house, not complying with arrest orders and fleeing back into her house. (Undisputed Facts ¶¶ 9, 10). It was only after Hokamp grabbed the door handle to enter the residence that Chief Miller grabbed her right arm to stop her and, at that point, Deputy Heinrich grabbed Hokamp's left arm to assist Chief Miller. (Undisputed Facts ¶ 10). This initial physical hands-on contact continued as Hokamp continued to actively resist by yelling at the officers and by pulling or leaning her body back and using deadweight tactics to avoid handcuffing. (Undisputed Facts ¶ 11).

During this initial contact, as shown in the video of the event, Deputy Heinrich secured Hokamp's left arm as he and Chief Miller attempted to gain Hokamp's compliance. (Undisputed Facts ¶ 10). He maintained control of her left arm by placing his hand on her left wrist and forearm as she continued to resist, pulled back and tried to sit on the floor. (Undisputed Facts ¶ 11). As in *Outlaw*, in this first series of physical contact with Ms. Hokamp, there was not an unreasonable use of force during that initial sequence of hands-on contact with her by the doorway, such that any claims of excessive force associated with this first sequence of contact must be dismissed, for Deputy Heinrich acted objectively reasonably.

### ii. Use of Taser

"[W]hether the deployment of [a] Taser was a reasonable use of force under the circumstances – is an objective inquiry that turns on how a reasonable officer would have perceived the circumstances." *Dockery*, 911 F.3d at 466. In *Dockery*, a police officer's repeated use of a taser on an actively resisting arrestee who failed to comply with orders while being booked into jail. *Id.* at 463, 467. Analogizing to one of its precedents involving the use of pepper spray, the *Dockery* court observed with respect to the second and third taser deployment that the case "closely tracks *Brooks v. City of Aurora*, which involved …a suspect who backpedaled and swatted at a police officer who was attempting to arrest him. The suspect then stood still and 'passively' faced the officers for a few seconds but did not manifest submission, so the officer pepper sprayed him." *Id.* at 468. Finding each use of the taser reasonable, the Seventh Circuit offered some guidance applicable here: "an officer's use of a Taser against and actively resisting subject either does not violate a clearly established right or is constitutionally reasonable." *Id.* at 467. Active resistance includes examples like kicking and flailing, declining to follow instruction while acting in a belligerent manner and trying to escape the control of law enforcement officers like swatting an arrestee's hands away while backpedaling. *Id.*

Here, Deputy Klemke observed the aforementioned events while standing behind Chief Miller and Deputy Heinrich. In turn, he warned Hokamp that she would be tased if she did not stop resisting. Specifically, as shown in the video, she did not stop resisting; instead, she continued refusing their orders, screaming and yelling at them, being defiant and using various forms of physical resistance like pulling away and using deadweight tactics. As she continued with all that behavior, Deputy Klemke deployed the taser. (Undisputed Facts ¶ 12). The taser probes struck Hokamp in the abdomen. (Undisputed Facts ¶ 13). She then appeared to remove the taser probes

and continued resisting with the same actions and behavior. (Undisputed Facts ¶ 13). Prior to the deployment of the taser, Hokamp's behavior did not reflect an intention to cooperate and comply with Chief Miller or the Deputies. Hokamp's continued active resistance and refusal to comply with Chief Miller and Deputy Heinrich resulted in Deputy Klemke's decision to take Deputy Heinrich's taser and deploy it in an effort to gain compliance. Further, unlike *Dockery*, the taser device was only used in one instance against Hokamp and not repeatedly used. (Undisputed Facts ¶ 13).

As a matter of law, Deputy Klemke's deployment of the taser was objectively reasonable given Hokamp's actions, demeanor, attempt to enter her residence and refusal to cooperate with law enforcement's requests. Hokamp had a valid arrest warrant issued against her for disorderly conduct and resisting an officer, (Undisputed Facts ¶ 4), attempted to enter her home in an act of refusal to comply (Undisputed Facts ¶ 9), stated her refusal to comply with law enforcement officers (*Id.*) and then actively resisted attempts to gain compliance even after being advised that the taser was going to be used, prior to deployment. (Undisputed Facts ¶¶ 11, 12). Her behavior is not the only relevant consideration making the deployment of the taser reasonable as shown in the video; in addition, the officers were attempting to effectuate an arrest on a small covered porch elevated about a foot over the front walkway and in close proximity to the door, walls and each body. Since verbalization and physical hands-on escorts and efforts were unsuccessful, it was reasonable to use the taser to gain compliance and, upon doing so, Deputy Klemke made the correct decision to reholster the taser and discontinue its use.

### iii. Moving Hokamp to Front Walkway and Placing her Face Down for Handcuffing.

The actions of Chief Miller and Deputy Heinrich in physically holding onto Ms. Hokamp and moving her to the front walkway for handcuffing, and laying her facedown for such

handcuffing, are common actions in police work when trying to gain control of an active subject. Far more forceful, quick, physical and direct actions – often called takedowns or decentralizations – in bringing an individual to the ground have met with constitutional approval. As noted above, takedown maneuvers have been found to be reasonable when an officer uses such a maneuver against an actively resisting individual, for whom there is probable cause to arrest, even for a municipal citation. *Outlaw*, 2021 WL 424224 at *5. See also Cibulka v. City of Madison, 992 F.3d 633, 640 (7th Cir. 2021) (court found no constitutional violation in a case involving physical takedown maneuvers; the court collected case law upholding such force and observed, "we fail to see how this routine police activity is an obvious constitutional violation. Indeed, cases involving arguably more forceful conduct indicate otherwise.").

Here, even after use of the taser, Hokamp continued to actively resist Chief Miller and Deputies Heinrich by removing the taser probes from her body and continuing to physically counteract and verbally protest her arrest. (Undisputed Facts ¶ 11-14). To gain compliance and secure Hokamp, she was moved from the small, cramped area of the front stoop where she was trying to use deadweight and pulling tactics, down one step onto the concrete walkway leading to the residence and then placed on her stomach so handcuffs could be placed on her. (Undisputed Facts ¶14). During this movement as shown in the video, it was far less instantaneous to the ground from an upright position than the direct physical efforts to bring an arrestee to the ground like in the aforementioned cases.

Hokamp also alleges that she complained about her prior shoulder surgery and that the use of force was so forceful that her "feet did not touch the ground" while they moved her from the front stoop to the prone position (Dkt. #1, p. 4), but such allegations are plainly refuted by the video of the events. (Undisputed Facts ¶ 14). At no point prior to this movement did she notify

the officers of her prior shoulder surgery; instead, only when they began to move off the front doorway stoop her did she exclaim she had a shoulder injury/surgery. That was not all she said and did however. Hokamp continued to display resistive actions. Once on the prone position, Deputy Klemke secured Hokamp's head and neck while Deputy Heinrich and Chief Miller secured Hokamp's left and right arms, and all the while she continued to yell and resist. (Undisputed Facts ¶ 6; Declaration Exh. 9 – 10:33:44 – 10:34:15). Throughout this particular sequence, there is no evidence that the officers used any more force than they would usually use on any person subject to an arrest in that situation. Hokamp's statement during that interaction that she had a shoulder problem and her claims that there was excessive force because of her shoulder ailment are not dispositive because the reasonableness of force under the Fourth Amendment is evaluated from the point of view of the officer, not from that perspective of the individual subjected to force. *Graham*, 490 U.S. at 396. From the point of view of the arresting officers, the decision to move Hokamp several feet away from the front doorway to an open area and to get her to a prone position for handcuffing was not objectively unreasonable when they had not yet received any information that she had a shoulder injury. Her contemporaneous statement about her shoulder and her hindsight-laden claim that it was unreasonable force *as to her* does not override this *Graham* standard and turn their decision-making in the moment (to move her to the open area by the front walkway) into a constitutional offense. The officers in-the-moment judgment, occurring in "circumstances that [were] tense, uncertain, and rapidly evolving," *Graham*, 490 U.S. at 395, does not offend the Fourth Amendment.

Hokamp alleges physical injuries including abrasions, reinjury to her left shoulder and her right big toe. (Dkt. #1). The extent of an injury caused by the use of force is a relevant, but not dispositive, factor in determining whether the use of force is excessive. See *Chelios v. Heavener*,

520 F.3d 678, 690 (7th Cir.2008). Here, her alleged injuries do not tilt the analysis in favor of a Fourth Amendment violation given the circumstances faced by the officers as described above and shown in the videos. Moreover, Hokamp has not offered any evidence to support any particular injury resulting from the use of force. No qualified medical expert has opined that she suffered any shoulder or toe injury due to the use of force during her arrest.

       iv. **Use of Restraint Chair at the Jail.**

       Hokamp's Complaint also alleges "defendants" used excessive force when transferring and by placing Hokamp in a restraint chair. (Dkt. #1, p. 3).

       Prior to her arrival at the Jail, Hokamp remained verbally aggressive and agitated, swearing at Deputies Klemke and Heinrich calling them "fucking bastards" and "assholes" and stating she would yell rape if anyone at the jail touched her. (Undisputed Facts ¶ 19). This behavior, when combined with her actions and resistance at the time of her arrest, necessitated Deputy's Klemke request to the Jail to have additional officers and the restraint chair available upon arrival in the Jail's sallyport. (Undisputed Facts ¶ 20). In the sallyport, Hokamp continued to act belligerently and refused to comply with Deputy Yambor as he attempted to speak and remove Hokamp from the squad car. She repeatedly yelled "no," cursed, yelled "rape" and attempted to get back into the vehicle during this process. (Undisputed Facts ¶ 21). Hokamp's defiant and resistive conduct and choices necessitated Deputy Yambor's decision to have her escorted into the restraint chair. The Jail deputies were not constitutionally required to wait and hope that Hokamp might eventually cooperate. *See Husnik v. Engles,* 495 F. App'x 719, 722 (7th Cir. 2012) ("In any event, because [the inmate] had freed his arm from the restraints, he posed an imminent threat to the officer's safety; waiting and hoping for him to relax was not an option."). The Seventh Circuit has also noted:

When an order is given to an inmate *there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force.* While . . . it was suggested that rather than not seek to enforce order, *it was possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, experience and common sense establish that a prison cannot be operated in such a way.*

*Colon v. Schneider*, 899 F.2d 660, 668-69 (7th Cir. 1990) (emphasis added). Courts have therefore allowed the use of a restraint chair in the jail setting for uncooperative and resisting detainees, see, e.g., *Cibulka v. City of Madison*, 448 F. Supp. 3d 1002, 1024 (W.D. Wis. 2020), aff'd, 992 F.3d 633 (7th Cir. 2021) ("Katzenmeyer resorted to the restraint chair only because Todd refused orders to cooperate, stand up, and walk out of the booking area to a segregation cell. If Todd had complied with orders to walk to the segregation cell, a restraint chair would not have been necessary."), and even when such person is perceived as being a security problem. See *Gentry v. English*, 2016 WL 4492832 at * 4 (July 5, 2016, N.D. Alabama) (Use of restraint chair was constitutional despite the fact that inmate was not actively resisting because jailers' "perception of a serious security problem was not unreasonable.").

The County Defendants did not violate Hokamp's constitutional rights by putting her Hokamp in the restraint chair and then keeping her in it for less than two hours. Even after struggling to get her out of the squad car in a peaceful or cooperative way, Hokamp continued to resist the County Defendants as they attempted to remove her hands from her handcuffs, and secure them in the restraint chair, which signaled she was continuing to exhibit behaviors that she did not intend to comply or cooperate. (Undisputed Facts ¶¶ 22, 24). This continued resistance, even after her initial placement and attempts to speak with Hokamp and calm her were made, demonstrated a need for continued restraint. Hokamp then continued to act belligerently and uncooperatively

while in the chair, even refusing medical examination (such as by curling her hands and fingers to avoid examination). (Undisputed Facts ¶ 25).

During the time in the restraint chair, Hokamp was checked by the County Defendants and other Jail employees. (Undisputed Facts ¶ 26). Yet, she remained combative with deputies and continued to yell and refuse medical attention until they were finally able to convince her to calm down. (Undisputed Facts ¶¶ 29, 32). She remained agitated and uncooperative even after being released from the restraint chair upon her request to use the restroom (Undisputed Facts ¶ 27), and she did not calm down until a social worker arrived and struck an accord with her to calm down if her came to the Jail. (Undisputed Facts ¶¶ 40-41).

Hokamp's repeated actions and behaviors made it reasonable to conclude that she would continue such behavior if released from the restraint chair after being placed in a cell and may have posed additional safety concerns and issues with maintaining order in the Jail. Indeed, even Hokamp admits that it would be reasonable for an unruly or agitated person to be placed in a restraint chair until the person cooperated and calmed down. (Undisputed Facts ¶ 33).

### v. Hokamp's Claims of Failure to Intervene Should be Dismissed as a Matter of Law.

Hokamp's Complaint makes vague references along the lines of failure to intervene. However, for the reasons as explained above, there is no underlying constitutional violation or unlawful use of force such that there was no cognizable failure to intervene claim at a threshold level. See *Fillmore v. Page*, 358 F.3d 496, 505-506 (7th Cir. 2004). Even if there was a constitutional violation, the standards for a failure to intervene claim have not been met.

"An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested,

or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).

Hokamp merely alleges that "other staff members" were present in the Jail sallyport when she arrived there. (Docket. #1, p. 5). First, she makes no allegations as to who should have intervened, or at what point they should have intervened or that the County Defendants had reason to know excessive force was being used. Additionally, Hokamp cannot show that the County Defendants should have had any reason to know that her constitutional rights were bring violated by an unlawful arrest, unlawful use of force during her arrest, or unlawful use of the restraint chair while at the Jail. In sum, it is her burden to show the particular constitutional violation at the particular point in the sequence of events and to tie that to another particular Defendant's "realistic opportunity" to prevent such violation.

### III. HOKAMP WAS PROVIDED MEDICAL CARE FOR HER COMPLAINTS AND REPEATEDLY REFUSED MEDICAL CARE SUCH THAT HER MEDICAL CARE CLAIMS MUST BE DISMISSED.

Ms. Hokamp's medical care claims are directed against Nurse Luebke wherein she alleges "medical negligence" for "omitting" or failing to address her injured left shoulder, broken right toe and taser prong left in her abdomen. (Dkt. #1, p. 6). At the time of her detention, however, she refused to cooperate with Nurse Luebke's assessment and complained of other conditions (namely, a stroke and wrist pain). (Undisputed Facts ¶ 32). In this litigation she has continued to obfuscate the inquiry into her claims. She has refused to provide medical authorizations which would allow access to her medical records, and she has not disclosed any medical expert providing any medical opinion that supports any of her medical claims.

17

For a plaintiff to prevail, she must show that the defendant's failure to provide medical care was objectively unreasonable under the circumstances and that such a deprivation caused harm. See *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011). Several factors are considered, such as "the relatively short period of time that a detainee spends in lockup is pertinent to the analysis. Some medical procedures are urgent, but many are not time-sensitive within a reasonable period." *Id*. at 531. The Seventh Circuit has noted others: (1) notice of the individual's medical need; (2) seriousness of the medical need; (3) scope of the requested treatment; and, (4) police interests (such as administrative, penological, or investigatory concerns). *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007). "The first [factor] is that the officer be given notice of the arrestee's medical need, whether by word …, or through observation of the arrestee's physical symptoms. " *Id*. The second and third factors have some overlap, as the Seventh Circuit explained in *Williams*:

> The severity of the medical condition under this standard need not, on its own, rise to the level of objective seriousness required under the Eighth and Fourteenth Amendment. Instead, the Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor — the scope of the requested treatment. In *Sides* for example, the court noted that the plaintiff was partially responsible for his lengthy detention outdoors, since he insisted that the officers not charge him at all, rather than requesting that the officers take him to the station house or write him a citation immediately.

*Id*. The fourth factor is "wide-ranging in scope and can include administrative, penological, or investigatory concerns," such as "the importance of an on-site investigation" and whether officers unreasonably prolonged the detention. *Id*.

Here, the first factor cannot be met. It is axiomatic that Nurse Luebke must have received notice of Hokamp's complaints pertaining to the shoulder, her toe or the stuck taser prong, but there was no such notice of such matters in this case. When the nurse spoke with Ms. Hokamp, the exchange did not include any complaints by Hokamp of the matters she now complains about.

Indeed, while the video of her arrest reveals Hokamp verbally complained of her shoulder *after* the officers moved her to the front walkway, she never once complained of any taser probe nor toe injury at that time to any of the arresting deputies. (Undisputed Facts ¶ 16).  During the transport to the Jail and upon being received at the Jail, she again made no complaints of any such injuries to any of the transporting or receiving deputies or the nurses standing by.  At 12:15 P.M., her yelling continued which included an assertion that her shoulder was injured, but she refused to have her vitals taken and was still uncooperative. (Undisputed Facts ¶ 32).  *Id*.  At 3:59, when she finally allowed the nurse to examine her, she complained of suffering a stroke but "[n]othing reported in her arms or legs." *Id*.  The nurse thus received no notice during her full assessment of Hokamp of a shoulder injury, taser prong or toe injury.  Even considering the record liberally with respect to her statements of shoulder pain, she made any such statement while yelling and refusing an assessment and had not yet calmed down.  Those circumstances did not provide provided the level of notice necessary to establish a claim.  The situation here is not too dissimilar from *Abdelkader Rachid Belbachir v. Cty. of McHenry*, 726 F.3d 975, 982 (7th Cir. 2013), where the court held a nurse was properly dismissed on summary judgment because, although she was treating the decedent for panic attacks and for anxiety, there was no evidence the nurse knew the decedent was suicidal – the ultimate issue giving rise to the suit.  See also, e.g., *Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007) (holding that no jury could find a Fourth Amendment violation because the plaintiff failed to offer proof of his need for medical attention).[1]

Moreover, even if she could establish notice, the second and third factors relating to seriousness of the medical issue and scope of treatment still lead to summary judgment dismissal.

---

[1] Ms. Hokamp did not submit a single written request for medical attention.  While that is not the only way to request medical attention, her uncooperative behavior underscores the difficulty staff had with her, the delay in booking her and her own failure to settle down and make any written request or complaint about her shoulder.

Hokamp received prompt and continuous medical attention during her 6-hour jail detention from the point where she was placed in the restraint chair, during her placement in the chair and after she had calmed down so that she could be evaluated and proceeding with booking.[2] The nurses evaluated Ms. Hokamp approximately every 30 minutes, per the orders of Dr. Ronquillo-Horton. (Undisputed Facts ¶ 26, 31-32). She was evaluated by a nurse at 11:42 A.M. and checked an additional 6 times by jail staff between 11:53 A.M. and 12:47 P.M. (Undisputed Facts ¶ 26). When she finally calmed down and allowed a full assessment at 3:59 P.M., she was assessed for trauma in her face and body, vitals were taken, her walking and cognition were noted, neurological assessment was done, her complaints were recorded and medical attention was given to her. (Undisputed Facts ¶ 32). In every instance, Hokamp refused or otherwise interfered with the nurse's efforts to do her job and focused their inquiry on her unruly behavior, alleged stroke and other issues, not the shoulder. *Id.* For instance, Hokamp repeatedly resisted medical attention while at the Jail by not allowing nurses to check her capillary refill on her fingers and stating she did not want her vital signs taken. When Hokamp complained of wrist pain, nursing staff examined her left wrist at 3:59 and noted "no swelling bruising or redness noted, good movement" again demonstrating their attention to Hokamp's concerns. *Id.* At every juncture, the care Hokamp received represented thoughtful medical decisions and the exercise of "professional judgment" to care for her generalized complaints despite her unruly behavior. The claims here should be dismissed just like in *Felix v. King Cnty. Corr. Facility*, 2008 WL 4534038, at *4 (W.D. Wash. 2008), where the nurse could not perform a thorough exam on the arrestee due to his uncooperative

---

[2] She was in jail for approximately 6 hours (arrived at Jail at 11:04 PM and released at approximately 5:30 PM). She was in the restraint chair for no more than 1 hour 58 minutes (seated in chair at 11:05 and released sometime between 12:45 and 1:02 PM). She was checked immediately by medical staff upon release from restraint chair. At around 3:59 PM, she was checked for complaints of a stroke and other complaints, and then was released 1 hour and 30 minutes later at approximately 5:30 PM.

behavior and found no swelling or pain with palpitation despite his complaints of an arm injury from his arrest.

Additionally, the fourth factor – the governmental interests – is wide-ranging and favors dismissal. The nurse acted appropriately in checking on her while in the restraint chair, waiting for Hokamp to calm down in order to do a full assessment and, upon release from the restraint chair, doing a full assessment with focus on the complaints of a stroke, the wrist and other non-shoulder concerns. There was no unreasonable delay. And, there is nothing in the summary judgment record that shows the nurse unreasonably failed to assess the shoulder.

Finally, on this claim, too, Hokamp's case has causation problems. Nothing in this case shows a causal connection established by expert medical opinion between any of her alleged injuries and the medical care she received, nor does it show a genuine dispute of a substantial departure from accepted professional judgment, practice, or standards. Causation is required. See *Whitlock v. Bruggemann*, 682 F.3d 567, 582 (7th Cir. 2012) (§ 1983 "must be read against the backdrop of tort liability," including that "the act must be the cause-in-fact of the injury, i.e., the injury would not have occurred absent their conduct"). Hokamp has not produced any expert opinion establishing any harm or injury attributable to any of the defendants, including the evaluation and treatment she received from Nurse Luebke. "'An inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence in the record* to establish the detrimental effect of delay in medical treatment to succeed.'" *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996) (quoted source omitted) (emphasis added). See also *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663-64 (7th Cir. 2016) (stating that where a plaintiff fails to provide expert testimony regarding whether a diagnosis and treatment plan substantially departed from accepted medical practices, he has failed to meet his burden and

summary judgment must be granted.)   Fed. R. Evid. 907 recognizes that certain legal issues and standards of proof cannot be assessed without assistance from a qualified professional. Medical treatment cases, including claims involving medication therapy and the diagnosis and treatment of possible acute conditions, fall into the category of cases requiring testimony.   Otherwise, any disgruntled patient could haul his or her providers into court based on nothing more than a mere disagreement with or displeasure with care. Medicine is not that simple.   For this reason, federal courts often say they will "not interfere with [a medical professional's] decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether [they] actually were exercising his professional judgment." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

In sum, Nurse Luebke provided medical care and treatment and made her decisions based on the relevant facts available to her, thereby providing Ms. Hokamp with adequate, reasonable medical treatment.   Hokamp's allegations of disagreement or of dissatisfaction with a medical professional's treatment does not create § 1983 liability. *Snipes v. DeTella*, 95 F.3d 586, 591-92 (7th Cir. 1996).

## IV.   THE COUNTY DEFENDANT'S ARE ENTITLED TO QUALIFIED IMMUNITY.

Government officials "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  This "qualified immunity" defense allows for reasonable errors "because officials should not err always on the side of caution [for the] fear of being sued." *Humphrey v. Staszek*, 148 F.3d 719, 727 (7th Cir. 1998).  The defense of qualified immunity shields government officials from liability for civil damages insofar as their

conduct does not violate statutory or constitutional rights that were clearly established at the time of the alleged conduct. *Reichie v. Howards*, 132 S.Ct. 2088, 2093 (2012).

A two-prong test exists to determine whether a claim is precluded by qualified immunity. First, the undisputed facts must be sufficient to establish an underlying constitutional violation. *Rakovich v. Wade*, 850 U.S. 1180, 1209 (1988). Second, the plaintiff must prove that the constitutional right at issue was "clearly established" with the requisite level of specificity prior to the date of alleged deprivation. *Id*. To overcome qualified immunity, a plaintiff must offer "controlling authority" or "a robust consensus of cases of persuasive authority" barring such conduct as of the date of the incident. *Reichie,* 132 S.Ct. at 2023.

In *White v. Pauly*, 137 S.Ct. 548 (2017), the Court emphasized the "longstanding principle" that "'clearly established law' should not be defined at a high level of generality," that "existing precedent must have placed the [] constitutional question beyond debate," and that qualified "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

Plaintiff in this case cannot establish a constitutional violation as a matter of law for the reasons explained above, and all claims are therefore barred under the first prong of qualified immunity.

Even if a constitutional violation can be established, all claims should still be dismissed as a matter of law under the second prong of qualified immunity because the constitutional right at issue was not clearly established on July 22, 2019.

Deputy Heinrich is entitled to qualified immunity related to his initial physical contact with Hokamp and his actions in moving her to the front walkway and placing her on her stomach for handcuffing, even if a constitutional violation is found to have occurred. As noted above, in *Outlaw* no constitutional violation was found related to the officer's initial contact, takedown or

decentralization of the plaintiff where the plaintiff was actively resisting arrest and engaged in a scuffle with the officer while being arrested for a municipal ordinance violation. *Outlaw* 2021 WL 424224 at *5. The *Outlaw* court noted the actions of the officer, similar to the actions of Deputy Heinrich here, had commonly been granted qualified immunity as an alternative basis for dismissal. *Id*. There is no clearly established law prohibiting an officer from securing a suspect who was attempting to flee arrest or moving her to a prone position, where the suspect is shouting, tensing their arms and using deadweight tactics in a manner consistent with someone who is resisting, and when such force caused only minor injuries. "Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." *Est. of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997). Such an action was not a violation of the Fourth Amendment in 1997, nor in 2020. See *Turner v. City of Champaign*, 979 F.3d 563 (7th Cir. 2020) (police officers did not use excessive force in restraining mental health detainee by pulling him to the ground, pinning down his shoulder and legs, handcuffing him, and applying leg restraints where detainee disregarded officers' commands to stop fleeing and actively resisted officers' attempts to restrain him).

Deputy Klemke is entitled to qualified immunity regarding his use of force involving the taser. Guidance can again be found in *Dockery*. The *Dockery* court looked to the case of *Brooks* by analogy when analyzing the merits of the use of the taser as discussed above, but it went on to make qualified immunity observations equally applicable here: "the officer was entitled to qualified immunity because the plaintiff 'ha[d] not submitted to the officer's authority, ha[d] not been taken into custody[,] and still arguably could [have] pose[d] a threat of flight or further resistance.'" 911 F.3d 468. Hokamp has not and cannot point to clearly established law that use of a taser under such circumstances as here deprives Deputy Klemke of qualified immunity.

To the extent Hokamp makes any use of force claims against Deputy Klemke for being involved in the handcuffing on the ground, Deputy Klemke is entitled to qualified immunity for the same reasons relative to Chief Miller and Deputy Heinrich.

Deputy Yambor removed Hokamp from the squad car and placed her in the restraint chair in a manner that did not violate Hokamp's constitutional rights due to her behavior and resistance and the minimal amounts of force use, as described above. Even if it was unreasonable force, Hokamp cannot cite to any clearly established law stating that removing a subject from a squad car, who is known to have been resistive and uncooperative with arresting officers and who is actively resisting and belligerently yelling and screaming accusations of rape, and the subsequent placement in a restraint chair violates an established constitutional right. No case law from the Supreme Court or Seventh Circuit clearly categorizes the use of a restraint chair as force. Nor can Hokamp cite clearly established law that prohibits jailers from keeping an unruly and resisting inmate in a restraint chair for less than two hours for safety reasons and to maintain order. The court in *Cibulka,* 448 F. Supp.3d at 1025, where the individual was restrained for nearly two hours, stated, "Plaintiffs have failed to identify any legal precedent that would have prohibited the deputies from using force to put an uncooperative arrestee into a restraint chair under the circumstances of this case." See also *Clark v. Gross,* 2016 WL 6638095, at *17 (D.S.D. Oct. 3, 2016) (holding that inmate's placement in restraint chair was not prohibited by clearly established law and recognizing the following: "what little case-law has been found regarding the appropriate use of a restraint chair, however, indicates it is not clearly established that the use of a restraint chair constitutes excessive force, especially when the chair is used to restore order, keep the peace, establish control, or maintain security.").

This same analysis of qualified immunity applies for any of the other deputies who may have assisted in putting her in the restraint chair, transported her in the restraint chair and observed her in the restraint chair, namely Deputies Heine, Wegner and Kanters. They all who acted under identical circumstances and in a similar manner to Deputy Yambor with regards to Hokamp's placement in the restraint chair. They did not commit any actions that rose to a level of a constitutional violation. Hokamp cannot point to any clearly established law that they were prohibited from putting her in the restraint chair or keeping her in the restraint chair for up to two hours. Indeed, there is a limited body of law regarding the use of restraint chairs that would have informed a reasonable officer that the actions they were undertaking clearly violated the constitution. Deputies Yambor, Heine, Wenger and Kanters are each entitled to qualified immunity related to any excessive force claims brought against them.

Finally, even if some alleged act or omission by Nurse Luebke could have violated the constitution, she too would be entitled to qualified immunity. No clearly established law informed Nurse Luebke that she should have conducted a full assessment any earlier than she did, or that upon doing her full assessment she needed to probe further beyond the complaints Hokamp was making at the time. Ms. Hokamp was released about 90 minutes after the assessment and after completing the booking process, and no clearly established law told Nurse Luebke that a reasonable nurse would be required to engage in any further assessment upon her release from the jail or any follow-up after the release.

## **CONCLUSION**

For the reasons explained above, Deputy Teri Wegner, Deputy Tom Klemke, Deputy Daniel Heinrich, Deputy Eric Heine, Deputy Scott Yambor, Deputy Matt Kanters, Nurse Amanda

Lenz and Nurse Sarah Luebke, respectfully ask the Court to grant their Motion for Summary Judgment and dismiss this lawsuit.

Dated this 11th day of October, 2022.

**MUNICIPAL LAW & LITIGATION GROUP, S.C.**

Attorneys for Deputy Teri Wegner, Deputy Tom Klemke, Deputy Daniel Heinrich, Deputy Eric Heine, Deputy Scott Yambor, Deputy Matt Kanters, Nurse Amanda Lenz, and Nurse Sarah Luebke

By: ___*/s/ Electronically signed by Remzy D. Bitar*
    REMZY D. BITAR
    State Bar No: 1038340
    LUCAS C. LOGIC
    State Bar No. 1115461
    P.O. ADDRESS:
    730 N. Grand Avenue
    Waukesha, WI 53186
    O: (262) 548-1340
    F: (262) 548-9211
    E: rbitar@ammr.net
      llogic@ammr.net