# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

PAMELA J. HOKAMP,

                Plaintiff,

v.

CHIEF MATTHEW MILLER,
DEPUTY TERI WEGNER, DEPUTY
TOM KLEMKE, DEPUTY DANIEL
HEINRICH, DEPUTY ERIC HEINE,
DEPUTY SCOTT YAMBOR, DEPUTY
MATT KANTERS, NURSE AMANDA
LENZ, and NURSE SARAH LUEBKE,

                Defendants.

Case No. 21-CV-1125-JPS

**ORDER**

## 1.      BACKGROUND

On September 28, 2021, Plaintiff Pamela J. Hokamp ("Plaintiff") filed this action against the (now retired) Chief of Police of the Town of Lake Mills Police Department, Chief Matthew Miller ("Miller), as well as against several Jefferson County Sheriff's Office Deputies and Jefferson County Jail employees, including Deputy Teri Wegner ("Wegner"), Deputy Tom Klemke ("Klemke"), Deputy Daniel Heinrich ("Heinrich"), Deputy Eric Heine ("Heine"), Deputy Scott Yambor ("Yambor"), Deputy Matt Kanters ("Kanters"), Nurse Amanda Lenz ("Lenz"),[1] and Nurse Sarah Luebke ("Luebke") (the "County Defendants" and together with Miller, "Defendants") pursuant to 42 U.S.C. § 1983. ECF No. 1. Magistrate Judge

---

[1] In their summary judgment submissions, the parties explain that they have stipulated to the dismissal of Lenz from this lawsuit. ECF No. 36 at 3.

Nancy Joseph screened Plaintiff's complaint and determined that it pleaded claims for false arrest, excessive force, and denial of medical treatment after incidents that occurred on July 22, 2019.[2] ECF No. 5. The case was later assigned to this branch of the Court.

On October 11, 2022, in accordance with the Court's trial scheduling order, Miller and the County Defendants, respectively, filed motions for summary judgment. ECF Nos. 32, 38. Also in accordance with the Local Rules and the Court's trial scheduling order, the parties submitted a stipulated, agreed-upon statement of undisputed, material facts, ECF No. 36, and Miller submitted an additional supplemental set of ostensibly disputed facts, ECF No. 35. On October 12, 2022, Plaintiff filed her own motion for summary judgment as well as a response to the stipulated statement of undisputed, material facts. ECF Nos. 41, 42.

On October 17, 2022,[3] Plaintiff filed a compendium of exhibits consisting of: photographs of abrasions on her face, abdomen, and toe;

---

[2]To the extent that Plaintiff reiterates allegations from her complaint in her summary judgment briefing that (1) she was not permitted to place a telephone call upon arrival at the Jail and (2) Heine threatened to enter her cell and change her into the uniform (but did not in fact enter or change her), those allegations did not survive screening and, at any rate, do not form cognizable constitutional claims. *See Pace v. Myers*, No. 16-CV-542-JPG, 2016 WL 3548498, at *4 (S.D. Ill. June 30, 2016) ("Plaintiff has not adequately pled a conditions of confinement claim here because . . . there is no liberty or property interest in a single phone call.") (collecting cases); *see generally Mulvania v. Sheriff of Rock Island County*, 850 F.3d 849 (7th Cir. 2017); *Titran v. Ackman*, 893 F.2d 145 (7th Cir. 1990); *Davis v. Gresko*, No. 15-CV-5, 2015 WL 5012611, at *4–5 (N.D. Fla. July 20, 2015) (analyzing claims relating to jail uniform as excessive force claims based on officers' conduct after entering cell and changing the detainees into the uniforms).

[3]The Court will accept the October 12, 2022 and October 17, 2022 filings as a timely motion for summary judgment filed by Plaintiff. *See Otis v. Demarasse*, 886 F.3d 639, 644 (7th Cir. 2018) ("We . . . have long recognized that pro se litigants must be afforded leniency . . . on procedural matters." ) (internal citations omitted).

treatment records as to her toe and shoulder; copies of Jefferson County Sheriff's Office policies and procedures; printouts of legal argument; and a statement from her sister. ECF No. 46. Miller and the County Defendants filed opposition briefs to Plaintiff's motion for summary judgment, ECF Nos. 53, 55, and in reply to her response to the stipulated statement of undisputed, material facts, ECF No. 54. Plaintiff did not file an opposition brief to either Miller's or the County Defendants' motion for summary judgment, nor did she file a reply brief in support of her motion. Her time to do so has lapsed. Civ. L.R. 56(b)(2), (3).[4] Separately, on December 29, 2022, Plaintiff filed a motion to quash Defendants' second notice of deposition. ECF No. 62.

The Court has reviewed the parties' cross-motions for summary judgment and will grant Miller's and the County Defendants' motions, ECF Nos. 32, 38, and deny Plaintiff's motion, ECF No. 41. Consequently, the Court will deny Plaintiff's motion to quash, ECF No. 62, as moot.

## 2.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016).

---

[4] As Defendants point out, by failing to respond to their arguments, Plaintiff concedes and waives those arguments. *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999). Nonetheless, the Court analyzes the arguments on their merits, given that Plaintiff filed her own motion for summary judgment and response to the stipulated statement of undisputed, material facts, noting where she conceivably challenges any of Defendants' arguments (and also which arguments are unchallenged), and whether such challenges are adequately supported. Fed. R. Civ. P. 56(c).

A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). "The court must not weigh the evidence presented or determine credibility of witnesses; the Seventh Circuit instructs 'that [the court] leave[s] those tasks to factfinders.'" *H–D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1010 (E.D. Wis. 2018) (quoting *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)). "[T]he non-movant need not match the movant witness for witness, nor persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

### 3.    FACTUAL SUBMISSIONS

The parties submitted a stipulated, agreed-upon statement of facts, which were the product of an in-person meet-and-confer that took place on September 8, 2022. ECF No. 36. The Court adopts those stipulated facts that are *material* with minor, non-substantive edits, including omitting internal citations for brevity. The parties' meet-and-confer notwithstanding, Plaintiff filed a response with the Court, ECF No. 42, to which Defendants filed a reply, ECF No. 54, as to the stipulated, agreed-upon statement of facts. The Court will note Plaintiff's factual disagreements accordingly, with citations thereto.

Where the Court supplements the parties' proffered facts with occurrences from the various video footage exhibits, which are described

further below, it also includes citations thereto.[5] Finally, Miller submitted a supplemental statement of facts, ECF No. 35; however, apart from two facts, which the Court notes herein, the Court finds Miller's submission repetitive of facts evident from the video footage or otherwise set forth in the parties' stipulated statement of facts.

### 3.1 Relevant Facts

On February 28, 2019, the City of Wisconsin Rapids issued Plaintiff Wisconsin Rapids Citation No. 3N80BJ1GGN and Wisconsin Rapids Citation No. 3N80BJ1GGM for "Disorderly Conduct" and "Resisting an Officer" in violation of Wisconsin Rapids' municipal code. On July 16, 2019, the Wisconsin Rapids Police Department entered two warrants (both embodied in Civil Process Warrant No. 3N80BJ1GGN) for Plaintiff's arrest for her failure to pay the citations.

On July 22, 2019, Plaintiff called the Lake Mills Police Department to her Lake Mills home[6] regarding an alleged violation of a restraining order against a non-party. Miller responded to the call, spoke with Plaintiff, and then returned to his squad car, where he ran Plaintiff's information and discovered the warrants, prompting him to call for back-up from Jefferson County Sheriff's deputies.

---

[5]*See Scott v. Harris*, 550 U.S. 372, 381 (2007) (while courts must view the facts in the light most favorable to the nonmoving party on summary judgment, they must also "view[] the facts in the light depicted by the video tape").

[6]The Court parenthetically notes that the proper venue for this action is more than likely the Western District of Wisconsin. 28 U.S.C. § 1391. However, Plaintiff chose the Eastern District of Wisconsin as her venue, Defendants never challenged venue, and, at this juncture, significant resources have been expended litigating the case in this District. *See, e.g.*, *Ward v. Delaney*, No. 01-C-3074, 2002 WL 31133099, at *2 (N.D. Ill. Sept. 20, 2002).

The following facts (Plaintiff's arrest, transport, and initial arrival at the Jefferson County Jail (the "Jail")) are all captured on video. The parties submitted footage from Plaintiff's doorbell camera, Klemke's body-worn camera, Heinrich's body-worn camera, the squad car camera, and the Jail camera. ECF No. 37-1. The parties agree that the videos accurately portray the visual and audio of the events.

After the deputies arrived at Plaintiff's residence at 10:32 A.M., Miller returned to Plaintiff's door and explained to Plaintiff that she had two warrants issued for her arrest from Wisconsin Rapids related to her disorderly conduct and resisting/obstructing and that the officers needed to take her to the Jail. Plaintiff contends that she never received a copy of the underlying citations, that she was unaware of the warrants, and that Miller did not show her the warrants. ECF No. 42. With Miller on her doorstep, Plaintiff immediately questioned the arrest warrants, said that she would not go to the Jail, and said that she would have to talk to her attorney and her sister. Plaintiff also informed Miller that she had cognitive impairments. ECF No. 37, Ex. 4 at 0:47, doorbell camera footage. All the while, Plaintiff kept her hand on the front door handle, and then attempted to open the door to go into her home. ECF No. 37, Exs. 4–5, doorbell camera footage. As Plaintiff began to open the door, Miller grabbed her arm, pulled her hand off the door handle, and told her that she was not allowed to enter the home because she was under arrest per the arrest warrants. *Id.* Heinrich also secured Plaintiff's other arm and either Miller, Heinrich, or both, told Plaintiff not to resist multiple times.

Plaintiff yelled at the officers to get off of her, and commenced swearing and cursing at the officers, while repeating the phrases, "No," "I am not going anywhere," "Why do they have me," "I don't care," "Knock

it off," and "Son of a bitch." ECF No. 37-1, Ex. 9, Klemke body-worn camera footage, at 0:53–1:20. While making these statements, Plaintiff lowered her body to a sitting-type position on her front porch/stoop and raised her feet off the ground. *Id.* According to Miller, Plaintiff used her weight to anchor herself in this position and support her resistance. ECF No. 35 at 2. During these events, Klemke pulled out Heinrich's taser from Heinrich's duty belt and told Plaintiff three separate times that the taser would be used. Plaintiff continued to exhibit the same physical conduct, and responded, "I don't care." ECF No. 37-1, Ex. 9, Klemke body-worn camera footage, at 1:04–1:12. Klemke then announced, "Taser, Taser, Taser," and deployed the taser on Plaintiff. Plaintiff pulled the taser out from her stomach area, and continued to yell and curse at the officers, including telling them to "knock it off," all while refusing to move from the sitting position on her front porch/stoop. *Id.* at 1:21–1:44. Plaintiff also swatted at the officers with her left hand, while yelling that she recently injured and had surgery on her left shoulder. *Id.* Plaintiff contends that she was tased twice, both on Miller's command to Klemke. ECF No. 46 at 2.

Miller and Heinrich eventually moved Plaintiff from the front stoop/porch to the front concrete walkway and placed her on her stomach. While she was being moved, Plaintiff continued to complain of shoulder pain and explain that she recently had shoulder surgery. ECF No. 37-1, Ex. 9, Klemke body-worn camera footage, at 1:34–1:44. Plaintiff contends that she was dragged 16 feet from the doorway and that Miller bent her feet 90 degrees while placing her on the pavement, thus breaking her right big toe. ECF No. 42. In order to handcuff Plaintiff, Klemke secured Plaintiff's head and neck while Miller and Heinrich secured Plaintiff's arms and put them behind Plaintiff's back. Plaintiff contends that this position rendered her

unable to breathe. ECF No. 42. Miller states that he and Heinrich used two sets of handcuffs due to Plaintiff having vocalized that she recently had shoulder surgery. ECF No. 35 at 2. At 10:35:05 A.M., the officers brought Plaintiff to her feet and walked her to the deputies' squad car, whereupon Miller's involvement ended in this matter. Plaintiff repeatedly asked the officers why she was being arrested, cursed at them as they walked her to the squad car, and informed them that she had urinated on herself. ECF No. 37-1, Ex. 9, Klemke body-worn camera footage, at 3:09–3:40.

Plaintiff was seated, handcuffed with her hands behind her back, in the squad car from approximately 10:36 A.M. to 11:05 A.M., when she arrived at the Jail and was removed from the squad car. On the way to the Jail, Plaintiff remained upset about what happened and continued to vocalize her belief that there were no valid warrants. Plaintiff also rejected the deputies' requests to cooperate and yelled "Assholes," "Fucking bastards," and "If anyone touches me, I am yelling rape."

In advance of arrival at the Jail, Klemke told the Jail staff that they would need more than one person to handle Plaintiff and to bring the restraint chair. Upon arrival at the Jail, where Yambor, Wegner, Kanters, Heine, Klemke and Heinrich were present, as was the restraint chair, Plaintiff became more agitated when Yambor attempted to remove Plaintiff from the squad car, at which time Plaintiff became verbally aggressive, resisted leaving the squad car, and yelled "Rape" three times.

Upon removal from the squad car, Plaintiff was placed in the restraint chair at about 11:05 A.M., at which time Yambor attempted to speak with her in a calming manner, but Plaintiff continued to yell and curse. Plaintiff was then wheeled into the Jail booking area in the restraint chair. At this point, Plaintiff's hands remained cuffed behind her back.

At approximately 11:13 A.M., Jail staff removed Plaintiff's hands from her handcuffs and secured her arms/hands to the restraint chair. The video shows Plaintiff writhing around in the restraint chair such that securing her arms/hands required the assistance of numerous officers.

At 11:17 A.M., while Plaintiff was in the restraint chair in the lobby, Luebke approached Plaintiff and attempted to speak with her, but Plaintiff was visibly upset and yelled at Luebke. Luebke tried to examine Plaintiff's hands and feet, but when she attempted a capillary check, Plaintiff pulled away and balled her hands into fists. According to the Medical Record Log, Plaintiff was extremely uncooperative and belligerent with Luebke.

Plaintiff was then placed in a holding cell at approximately 11:24 A.M., at which time a restraint chair check log was started and continued as follows:

- 11:29 OK per 446 [Yambor]
- 11:42 OK per 446 – Evaluated by nurse [Yambor]
- 11:53 OK per 446 [Yambor]
- 12:01 OK per 402 [Wegner]
- 12:08 OK per 548 [Kanters]
- 12:16 OK per 446 [Yambor]
- 12:25 OK per 446 and 548 [Yambor and Kanters]
- 12:47 OK per 417 [non-party Sgt. Brost]
- 12:55 Yelling/Screaming per 431 [non-party Captain Gray]
- 13:02 Removed from chair per 417 [non-party Sgt. Brost]

Between 12:45 P.M. and 1:02 P.M., Plaintiff was removed from the restraint chair upon her request to use the restroom. Plaintiff disputes that she was removed from the restraint chair at this time, and contends it was closer to 4:00 P.M. ECF No. 42. Plaintiff further disputes that she asked to use the restroom, noting that she had already urinated on herself during her arrest.

*Id.* After Plaintiff was removed from the restraint chair, she began pacing around her cell, yelling, and repeatedly kicking the door to the cell.

According to Jail medical logs, nursing staff had placed a call to Dr. Ronquillo-Horton, the Jail doctor, at 11:31 A.M. regarding Plaintiff's placement in a restraint chair. Dr. Ronquillo-Horton determined that Plaintiff was to have visual checks every 30 minutes with attempts to take her vital signs if possible, due to her combative nature, and stated that Plaintiff would need to be "sent out" to another facility if she appeared to decline in status. Those "visual checks" started and continued as follows:

- 11:45: Alert and oriented x. Inmate yelling continuously. Visual check done on inmate, toe capillary is good in bilateral feet. Unable to complete capillary check in bilateral hands as inmate kept fingers curled. Inmate noted to be sweaty on chest and forehead, but very agitated for extended period of time. Inmate unable to move her hands, noted to be rotating them frequently. She was also noted to have urinated herself. Inmate extremely agitated and refused to let staff do an assessment.

- 12:15: Inmate visually assessed while in holding cell, asked if she wanted her vitals to be taken. She continued to yell, stating that she didn't need her vitals taken, she needed to make her phone call, and that her rights have been violated from being in the chair too long, that her shoulder was injured, and she was going to sue. Refused vitals to be taken.

- 12:45: Inmate being moved in restraint chair to a different holding cell to use the restroom. Restraint straps were removed and inmate refused to get out of the seat. She continued to yell about her phone call and being injured. She became combative with the deputies and put in a holding cell unrestrained. She was noted to be moving well once not in chair, moving arms equally, and kicking door repeatedly for an extended

period of time after being removed from holding cell. Writer went up to holding cell and tried to ask inmate if she was on any medications or if she had a seizure history, she refused to answer any questions. It was also noted that "Per deputy, inmate asking to see a nurse and to use the restroom. Unknown reason to why she wanted to see a nurse."

- 3:59: Inmate was seen in nurse's office for reports of a stroke. Deputy standing by. Writer asked inmate if she had a history of strokes and she said yes . . . which is why she has numbness to the right side of her face. She claims that because of the "trauma inflicted" on her today, that she has had another stroke. Asked inmate to smile for assessment, and she refused, claiming she was a nurse and knew what a stroke was. Writer noted good movement with mouth when speaking, no drooping in facial muscles, and eye lids bilateral. She only reports numbness in her face. Nothing reported in her arms or legs. When asked if she received treatment in the past for her strokes, she said no. Since strokes were only trauma induced, she was never prescribed any medicine and no treatment sought. […]

  Claiming also that there was trauma to her left wrist from today, no swelling, bruising or redness noted, good movement. Initially refused for nurse to take vitals, then allowed vitals to be taken. Inmate agitated while in office, yelling during conversation. Was told to return to cell with deputy, as nurse needed to call MD for orders, inmate states she needs her own doctor and will not go to Fort. No difficulty walking, no change in cognition, understood all questions asked by nurse, no slurred speech, no reports of issues seeing, no reported headache.

At some point, non-party Jefferson County Human Services Counselor Rebecca Gregg ("Gregg") received a call from Wegner. Wegner informed Gregg that Plaintiff was arrested and had been combative and agitated, requiring a restraint chair. Wegner further informed Gregg that

Case 2:21-cv-01125-JPS   Filed 01/09/23   Page 11 of 37   Document 63

Plaintiff was removed from the restraint chair and had begun kicking the door, hitting her head on the cell wall, and was unable to be redirected by Jail staff. At that point, Gregg agreed to report to the Jail to see Plaintiff.

Upon arrival, Gregg observed Plaintiff agitated and repeatedly kicking the cell door and yelling. Gregg explained to Plaintiff that Plaintiff was in custody related to the warrants and that she would not be released until the warrants were quashed or she was seen in court. Gregg continued efforts to deescalate Plaintiff. Plaintiff refused to change into the Jail uniform from her street clothes and, instead, a compromise was made to remove a string from one of her articles of clothing and one t-shirt layer while allowing her to wear her street clothes to avoid further trauma. Plaintiff contends that prior to this, Heine threatened to enter her cell and physically remove her clothes to change her into the Jail uniform. ECF No. 1 at 6; ECF No. 42.

Because Gregg believed it was too risky to remove Plaintiff from the holding cell given Plaintiff's agitated state, Plaintiff gave Gregg permission to contact Plaintiff's sister and said that she would calm down if her sister arrived at the Jail to bail her out. Under this arrangement, at approximately 3:02 P.M., Plaintiff was sufficiently cooperative to complete the booking process. Plaintiff's sister posted Plaintiff's bail and Plaintiff was released between 5:28 P.M. and 5:36 P.M.

Following these events, the District Attorney charged Plaintiff with "Disorderly Conduct" in violation of Wis. Stat. § 947.01(1) and "Resisting or Obstructing an Officer" in violation of Wis. Stat. § 946.41(1), for both of

which she was found guilty due to a no contest plea.[7] ECF No. 37-15 at 5. At her sentencing hearing, Plaintiff confirmed that (1) she understood the elements of the charges to which she was pleading no contest, after which the circuit court read her those elements and further confirmed her understanding, (2) a no contest plea means she will "be found guilty the same as if [she] had pled guilty," and (3) the criminal complaint set forth a sufficient factual basis for the court to accept her plea. *Id.* at 4–5, 8–9, 11. The circuit court found that Plaintiff gave "heavy resistance" after being informed of her warrants, had "resistive tension in her body," was "yelling profanities," and "continued being boisterous after being taken out of the squad [car]."*Id.* at 17. The circuit court sentenced Plaintiff to time served and payment of costs associated with the case. *Id.* at 18–19. In her present submissions, Plaintiff now disputes that charges were filed. ECF No. 42.

4.      **ANALYSIS**[8]

4.1      **Plaintiff's False Arrest Claim**

Defendants argue, and the Court agrees, that Plaintiff's false arrest claim fails as a matter of law because she was arrested pursuant to a valid

---

[7]*See State v. Hokamp*, 2020CM000001 (Jefferson Cnty. Cir. Ct. Jan. 2, 2020), *available at* https://wcca.wicourts.gov/ (last visited Jan. 3, 2023).

[8]The Court agrees with Defendants' contention, *see, e.g.*, ECF No. 39 at 4, that Plaintiff's pleadings lack specificity as to which Defendants were personally involved in which alleged constitutional deprivation. *See, e.g., Brown v. Ill. Dep't of Pub. Aid*, 318 F. Supp. 2d 696, 700 (N.D. Ill. 2004), *aff'd*, 132 F. App'x 51 (7th Cir. 2005) ("[A]llegations of unequal treatment . . . made generally against all defendants, fail[] to allege[] the element of personal involvement necessary for individual liability under § 1983."). Thus, the Court parses Plaintiff's claims to ascertain which Defendants she alleges "caused or participated in" each constitutional violation, and analyzes the claims against those Defendants accordingly. *See, e.g., Wallace v. Alexander*, No. 20-CV-1058-JPG, 2020 WL 5993221, at *2 (S.D. Ill. Oct. 9, 2020).

warrant.[9] "[A] person who is arrested pursuant to a facially valid warrant, as [plaintiff] clearly was, generally has no claim for an unconstitutional deprivation of liberty under section 1983." *Mark v. Furay*, 769 F.2d 1266, 1268 (7th Cir. 1985) (citing *Baker v. McCollan*, 443 U.S. 137, 144 (1979) (holding that "[a]bsent an attack on the validity of the warrant," or "detention pursuant to a valid warrant" without due process "after the lapse of a certain amount of time," arrest pursuant to a valid warrant "gives rise to no claim under the United States Constitution")).

Plaintiff's only challenge to the warrants is that she was unaware of them as well as the underlying citations, and that Miller did not show her the warrants. ECF No. 42. These arguments are immaterial in the face of a facially valid warrant. The relevant analysis concerns what the officer knew at the time of arrest, and the officer is not required to produce a copy of the warrant. *See Mark*, 760 F.2d at 1268 (citing *Baker*, 443 U.S. at 144) (arrest pursuant to facially valid warrant was constitutional despite fact that plaintiff was arrested on warrant intended for his brother); *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989) ("Regardless of the defendants' motives toward the plaintiff, the existence of probable cause for arrest is an absolute bar to a Section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution."); *Cannon v. Gray*, No. 15-CV-1370-PP, 2016 WL 3676472, at *3 (E.D. Wis. July 7, 2016), *aff'd sub nom. Cannon v. Newport*, 850 F.3d 303 (7th Cir. 2017) ("In determining whether the plaintiff has sufficiently alleged facts that indicate that defendant['s] arrest of the plaintiff violated the Fourth Amendment, the court must look,

---

[9]The Court has examined the warrants, which are attached as Exhibit 25 to the Declaration of Lucas C. Logic. ECF No. 37-9.

not at whether [the defendant] had a copy of the warrant in his possession when he arrested the plaintiff, but at whether a valid warrant existed.").

Plaintiff does not contend, or present factual materials supporting any such contention, that Defendants concealed or misrepresented facts in procuring the warrants, or otherwise raise a factual challenge with respect to probable cause. *See Schertz*, 875 F.2d at 582. Nor does her approximately six-hour detention deprive her of liberty without due process of law. *Baker*, 443 U.S. at 145 (three-day detention "does not and could not amount to such a deprivation"); *see also* Wis. Stat. § 970.01. Consequently, Defendants are entitled to summary judgment on Plaintiff's false arrest claim, and the claim will be dismissed with prejudice on this basis.[10]

---

[10]Parenthetically, any such challenge to probable cause at this juncture would be barred by the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994):

> An example of . . . a § 1983 action that does not seek damages directly attributable to conviction or confinement but whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful—would be the following: A state defendant is convicted of and sentenced for the crime of resisting arrest, defined as intentionally preventing a peace officer from effecting a lawful arrest . . . . He then brings a § 1983 action against the arresting officer, seeking damages for violation of his Fourth Amendment right to be free from unreasonable seizures. In order to prevail in this § 1983 action, he would have to negate an element of the offense of which he has been convicted. Regardless of the state law concerning res judicata . . . the § 1983 action will not lie.

*Heck*, 512 U.S. at 483 n.6. That is precisely what happened here. Plaintiff was charged with, found guilty of, and sentenced accordingly, based upon a violation of Wis. Stat. § 946.41(1). Plaintiff's argument that no charges were filed is belied by the record, which contains the docket sheet and filings from her state criminal case. In addition to being part of the record, the Court may take judicial notice of the case and its filings. *See, e.g.*, *Halliburton v. Hockaday*, No, 18-CV-2081, 2019 WL 2270586, at *1 (C.D. Ill. May 28, 2019). As contemplated by *Heck*, and recited to Plaintiff during her sentencing hearing, an element of a Section 946.41(1) violation is that "the officer was acting with lawful authority." ECF No. 37-15 at 8.

Case 2:21-cv-01125-JPS   Filed 01/09/23   Page 15 of 37   Document 63

### 4.2 Plaintiff's Excessive Force Claim

Plaintiff pleads four instances of alleged use of excessive force: (1) Miller's initial, hands-on contact by way of grabbing Plaintiff's right arm when she tried to enter her home after he informed her of the warrants, and Heinrich's stabilization of Plaintiff's left arm, ECF No. 1 at 4; (2) Klemke's use of the taser, which Plaintiff contends occurred twice on Miller's command, *id.*; (3) Miller, Klemke, and Heinrich's physical movement of Plaintiff off her front walkway and placement of her face-down for handcuffing, which Plaintiff maintains involved dragging her 16 feet and forceful bending of her toes to a 90-degree angle, which reinjured her shoulder following recent surgery and broke her right big toe, *id*; and (4) the officers' removal of Plaintiff from the squad car and placement into the restraint chair, *id.* at 4–5.

Defendants argue that the degree of force used in all four instances was objectively reasonable, and that, even if Plaintiff did establish a constitutional violation, they are entitled to qualified immunity because the constitutional right that was allegedly violated was not clearly established on July 22, 2019. For the reasons explained below, the Court agrees that the use of force here was objectively reasonable and does not amount to a constitutional violation as a matter of law. Because the facts make out no constitutional violations, and case law demonstrates that the rights alleged by Plaintiff were not clearly established on July 22, 2019, the claims are also barred by the qualified immunity doctrine.[11] In other words, Plaintiff has

---

[11]Although not explicitly pleaded, to the extent Plaintiff's complaint raises claims against any Defendant for failure to intervene, those claims fail on their merits for the reasons explained in this Order. *Lanigan v. Village of E. Hazel Crest, Ill.*, 110 F.3d 467, 477 (7th Cir. 1997) (underlying constitutional violation is required element for failure to intervene claim). Because the Court does not find any use of

not met her burden of showing that Defendants' actions were objectively unreasonable in order to defeat their assertions of the qualified immunity defense.

### 4.2.1   Legal Standard

"[A]ll claims that law enforcement officers have used excessive force . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "The reasonableness inquiry is an objective one, examining 'whether the officer's actions are objectively reasonable in light of the totality of the facts and circumstances confronting him or her, without regard for consideration of the officer's subjective intent or motivations." *Payne v. Stacy*, Case No. 18-CV-850, 2020 WL 886185, at *3 (E.D. Wis. Feb. 24, 2020), *appeal dismissed*, Case No. 20-1509, 2020 WL 5793102 (7th Cir. June 12, 2020) (citations omitted). The actions taken by an officer "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citations omitted).

Whether a degree of force is reasonable under the Fourth Amendment is influenced by "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citations omitted). "If the suspect is mentally ill, the officer's awareness of his mental illness is also a factor in the analysis." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).

---

excessive force or other constitutional violation, there is no cognizable failure to intervene claim against any of the Defendants.

Case 2:21-cv-01125-JPS   Filed 01/09/23   Page 17 of 37   Document 63

While "a plaintiff who has been convicted of resisting arrest or assaulting a police officer during the course of an arrest is not per se *Heck*-barred from maintaining a § 1983 action for excessive force stemming from the same confrontation," the *Heck* bar will kick in if the plaintiff "makes allegations that are inconsistent with the conviction's having been valid." *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006). For example, where a plaintiff convicted of resisting arrest denies that she resisted, such an allegation would be inconsistent with the validity of the state conviction. *Id.* However, where a plaintiff "claims that [she] suffered unnecessary injuries because the officer's response to his resistance was not, under the law governing excessive use of force, objectively reasonable," such a claim is not *Heck*-barred. *Id.* (citing *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006)).

A *Heck* bar will apply to "carve off" inconsistent contentions regarding a plaintiff's resistance (or alleged lack thereof) even where the plaintiff pleaded no contest to resisting arrest in state court. *Geboy v. Oneida County*, No. 19-CV-574-BBC, 2020 WL 7398660, *4–6 (W.D. Wis. Dec. 17, 2020). Thus, in the instant action, Plaintiff is barred from asserting allegations inconsistent with her state conviction for resisting arrest. *See also Johnson v. Rogers*, 944 F.3d 966, 968 (7th Cir. 2019) ("Johnson, however, does not deny that he tried to obstruct the police from maintaining custody after his arrest. He contends only that Rogers used force that was unreasonable in relation to the nature of his obstruction. This contention can be resolved in Johnson's favor without casting any doubt on the validity of his conviction. It follows that *Heck* does not block this suit.").

In turn, the qualified immunity doctrine protects government officials from civil liability when they perform discretionary functions

"insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome a defendant's claim of qualified immunity, "the plaintiff[] must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Id.* (citations omitted).

Notably, "[a]s applied to a Fourth Amendment excessive-force claim, the qualified-immunity doctrine gives 'enhanced deference to officers' on-scene judgments about the level of necessary force.'" *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018) (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 725 (7th Cir. 2013)). Thus,

> even if the plaintiffs demonstrate that excessive force was used, *they must further establish that it was objectively unreasonable for the officer to believe that the force was lawful*—i.e., they must demonstrate that the right to be free from the particular use of force under the relevant circumstances was 'clearly established.'

*Abbott*, 705 F.3d at 725 (emphasis added).

### 4.2.2 Miller's and Heinrich's Initial Contact with Plaintiff's Arms

"When a police officer has probable cause to arrest a person, there is nothing excessive about the officer grabbing that person to effect the arrest." *Outlaw v. Village of Shorewood*, No. 19-CV-1092, 2021 WL 424224, at *4 (E.D. Wis. Feb. 8, 2021). The video footage shows that, after Miller informed Plaintiff that she was under arrest and needed to come with him to the Jail, Plaintiff said that she would not go with him, reached for the door handle, and commenced opening the door to her home. ECF No. 37,

Exs. 4–5, doorbell camera footage. Only then did Miller place his hand on her arm. *Id.* The video footage shows that Miller placing his hand on Plaintiff's arm was not enough to deter Plaintiff, as Plaintiff continued to try to open the door, which required Miller to pull Plaintiff's right hand off the door handle while Heinrich secured her left arm. *Id.*

To the extent that Plaintiff argues that the pulling of her arm is what caused her left shoulder injury to re-flare, the video footage is clear that she continued to resist and attempt to pull away and enter her home even after Miller placed his hand on her arm without pulling on it. *See Outlaw*, 2021 WL 424224, at *4 ("[Plaintiff's] allegation that [defendant] used excessive force by "yanking [her] arms" is meritless. There is no hint that any yanking was anything other than the force reasonably necessary to attempt to overcome [plaintiff's] attempts to pull away from [defendant]."); *see also Payne v. Pauley*, 337 F.3d 767, 780 (7th Cir. 2013). Nor does the fact that Plaintiff's warrants were for unpaid municipal citations tilt the analysis in her favor. "A police officer may arrest a person for even the most minor of offenses, such as . . . violating a municipal ordinance." *Outlaw*, 2021 WL 424224, at *4 (collecting cases).

Separately, after Miller informed Plaintiff of the arrest warrants, Plaintiff brought her "cognitive impairments" to Miller's attention. *Cyrus*, 624 F.3d at 862; *see also Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (finding that "the plaintiff's evidence that [the officer] was aware of [the decedent's] mental disabilities" "may . . . be deemed relevant to the reasonableness inquiry"). The Court therefore takes Plaintiff's mental illness into consideration, in conjunction with the other *Graham* factors. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003). However, even where mental illness is a factor, such mental illness

does not overcome that some force is justified to restrain a person who is actively resisting arrest. *Id.*; *see also Turner v. City of Champaign*, 979 F.3d 563, 569–70 (7th Cir. 2020) (where person with mental illness did not "submit[] to the authority of spoken police commands," grabbing the person's shoulder to "stop his flight" was not excessive use of force).

Accordingly, given the totality of the circumstances, most notably Plaintiff's continuing physical resistance, Miller's and Heinrich's grabbing, pulling, and stabilization of Plaintiff's arms were objectively reasonable. Alternatively, because the facts do not make out a constitutional violation, and even if they did, case law does not demonstrate that the right to be free from this particular use of force was clearly established on July 22, 2019, Miller and Heinrich are entitled to qualified immunity. In other words, Plaintiff has not met her burden of showing that Miller's and Heinrich's actions were objectively unreasonable in order to defeat Miller's and Heinrich's assertions of qualified immunity.

### 4.2.3 Klemke's Use of the Taser

As an initial matter, despite Plaintiff's protests to the contrary (i.e., that Klemke tased her twice, both times as commanded by Miller), the video footage makes clear that Plaintiff was tased only once by Klemke, and that Miller did not instruct Klemke to use the taser. ECF No. 37-1, Ex. 9, Klemke body-worn camera footage, at 0:53–1:44.

An officer may permissibly use a taser to apprehend a suspect who is actively resisting arrest or fleeing. *Abbott*, 705 F.3d at 728 (use of a taser on a suspect who has "'displayed an unwillingness to accede to reasonable police commands'" is reasonable). *Id.* (quoting *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011)). For example, in *Dockery*, 911 F.3d at 467, the Seventh Circuit found that it was objectively reasonable for the officer to

deploy her taser on the plaintiff. The plaintiff claimed that he was not actively resisting; however, video footage showed that he was uncooperative and physically aggressive, rocking back and forth, and twice escaping multiple officers' grasps. *Id.* After falling backwards, the plaintiff "wildly kicked" in the officers' direction and "immediately jumped to his feet." *Id.*

On the other hand, the Seventh Circuit has held that it is unreasonable for officers to use force on passive subjects. *See Rambo v. Daley*, 68 F.3d 203, 207 (7th Cir. 1995) ("The Constitution clearly does not allow police officers to force a handcuffed, passive suspect [who did not attempt to flee or physically resist the officers] into a squad car by breaking his ribs."). Similarly, in *Abbott*, 705 F.3d at 732–33, the court determined that no reasonable officer could have understood a subject, who, after being tased, was lying motionless on the ground, to be actively and physically resistant.

Based on the video footage, after her initial struggle with Miller and Heinrich, Plaintiff told the officers to get off of her, and continued to yell that she would not go with them. While making these statements, she lowered her body to a sitting-type position on her front porch and raised her feet off the ground. Plaintiff has not challenged Miller's contention that she was using her weight to brace herself on the ground and out of the officers' reach, which contention is supported by the video footage. Moreover, it is relevant that one of the municipal citations for which a warrant had been issued was for resisting an officer, which heightened Plaintiff's threat level. *See Forrest v. Prine*, 620 F.3d 739, 745 (7th Cir. 2010) ("Officer Prine was aware that Mr. Forrest had attacked an officer earlier in the night . . . . Mr. Forrest does not dispute that he appeared to be

Case 2:21-cv-01125-JPS   Filed 01/09/23   Page 22 of 37   Document 63

intoxicated, and, consequently, the officer reasonably could have perceived him as acting unpredictably.").

Also based on the video footage, Klemke warned Plaintiff three separate times that she would be tased. Despite these warnings, Plaintiff maintained the same physical conduct and affirmatively responded, "I don't care." *See Forrest*, 620 F.3d at 745 (use of taser was reasonable where "before employing the taser, Officer Prine warned Mr. Forrest several times that noncompliance would result in tasing [and] Mr. Forrest did not heed the warnings").

As explained above, Plaintiff is *Heck*-barred from arguing that she did not resist arrest given the state court's findings of, among others, "heavy resistance." Nonetheless, in her motion for summary judgment, she argues that the deputies "misinterpreted [her] reaction when excessive force was used against [her] as [her] being non-compliant." ECF No. 41. However, *even if* there was no *Heck* bar, *Dockery* makes clear that intent is immaterial to the Court's evaluation of an excessive force claim. *Id.* at 463. In that case, the plaintiff argued that he was not intentionally resisting, but that he lost his balance due to his size and inflexibility, as well as his pain from being handcuffed. *Id.* The Seventh Circuit explained that because "[e]xcessive force claims are evaluated against a standard of objective reasonableness . . . . [w]hether Dockery actually intended to resist" did not matter. *Id.*

Plaintiff also argues that Defendants did not follow their "own policy and procedures," ECF No. 41, including the "use of force continuum[,] which is not physical, calm non threatening commands," ECF No. 42 [*sic* throughout]. In support of this argument, Plaintiff attaches Jefferson County Sheriff's Office policies and procedures directing that only

the minimum amount of force reasonably necessary should be used, which includes "attempts to gain compliance through a 'show of force' and/or the threat (ultimatum) to apply physical force unless compliance is achieved." ECF No. 46 at 39. The policies also dictate that "[p]hysical force may be applied when a non-physical force option has proven ineffective or would clearly be ineffective in a given situation in order to accomplish control," and reiterate the substance of the *Graham* factors. *Id.* at 39, 56.

"However, 42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices." *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) (collecting cases holding that evidence of police department policies is irrelevant in the Fourth Amendment reasonableness analysis). Even if the Court were to deem the Jefferson County Sheriff's Office policies and procedures relevant to the reasonableness analysis, based on the record before it, Defendants followed those policies and procedures here. *Abdullahi*, 423 F.3d at 772.

Based on the foregoing, and considering the totality of the circumstances, including Plaintiff's mental illness, it was objectively reasonable for Klemke to deploy his taser because Plaintiff was far from subdued, and was actively physically resisting arrest. Alternatively, because the facts do not make out a constitutional violation, and even if they did, case law does not demonstrate that the right to be free from this particular use of force was clearly established on July 22, 2019, Klemke is entitled to qualified immunity. In other words, Plaintiff has not met her burden of showing that Klemke's actions were objectively unreasonable in order to defeat Klemke's assertion of qualified immunity.

### 4.2.4 Miller, Klemke, and Heinrich's Movement of Plaintiff and Placement of Plaintiff in the Prone Position

The video footage shows that, after being tased once, Plaintiff pulled the taser out of her stomach and continued to engage in the same conduct as prior to tasing. Specifically, she yelled and cursed at the officers, telling them to "knock it off," and carried on physically resisting by bracing herself in a sitting position on her front porch/stoop. She also swatted at the officers. Plaintiff's actions are similar to those of the plaintiff in *Dockery*, who after being tased once, "sat up, pulled the Taser prong out of his arm, and ignored the officers' instructions to lie down." 911 F.3d at 468. It is clear that an objectively reasonable officer could have perceived Plaintiff's continued resistance after being tased as an act of non-compliance. *See id.*

In *Dockery*, the Seventh Circuit held that, due to such non-compliance, a second deployment of the taser was protected by qualified immunity. In Plaintiff's case, the next use of force did not rise to this level; the taser was never deployed a second time. Instead, Miller, Klemke, and Heinrich moved Plaintiff from her front porch/stoop down to her front concrete walkway and placed her in the prone position on her stomach. Plaintiff argues that she was dragged 16 feet across the ground off of the front porch/stoop. While it is difficult to discern from the video footage how far Plaintiff was moved, it is clear that she was lifted up off of the front porch/stoop and carried to the front walkway—not dragged. While she was lifted and carried, Plaintiff informed the officers, as she had while seated on her front porch/stoop, that her shoulder hurt and that she recently had shoulder surgery. Plaintiff accordingly claims that lifting her off the front porch/stoop and placing her in the prone position caused reinjury to her

shoulder. She further argues that after she was placed in the prone position, Miller bent her feet 90 degrees, which broke her right big toe.

These facts closely resemble those in *Turner*. 979 F.3d at 569. There, a person with known mental illness "did not respond to the first physical contact by complying with the officers' commands," and continued "resisting and trying to pry himself away from the officers." *Id.* The Seventh Circuit held that "escalating force . . . was a constitutionally permissible response to [the person's] continued resistance," including placement of the person in a prone position, pinning him down, and handcuffing him. *Id.*

The video footage belies Plaintiff's assertion that Miller bent her feet 90 degrees while placing her in the prone position. Even if her placement in the prone position caused her toe to break, use of techniques "meant to induce cooperation," even if they cause injury, are reasonable in the face of active resistance. *See Turner*, 979 F.3d at 569 (citing *Fitzgerald v. Santoro*, 707 F.3d 725, 734 (7th Cir. 2013) (arm-bar and wrist-lock techniques that broke protective detainee's arm were not excessive because she was actively resisting attempts to place her into an ambulance; "We have repeatedly upheld officers' use of force in the face of suspects resisting arrest."); *Johnson*, 944 F.3d at 969 ("Any takedown can go awry . . . but, if the officers use steps reasonably likely to effect a clean takedown, an injury does not lead to liability.").

Additionally, Plaintiff has not submitted any evidence to refute Defendants' suggestion that she may have injured her toe while kicking her cell door. *Fitzgerald*, 707 F.3d at 735 ("We note, however, that based on her own deposition testimony, the last act prior to Fitzgerald's wrist snapping was her grabbing her own right arm with her left hand and trying to wrench

it from Officer Cram's grip. In other words, the broken wrist seems to be better evidence of Fitzgerald's use of force than Officer Cram's.").

As to Plaintiff's shoulder, the video footage shows that Plaintiff informed Miller, Klemke, and Heinrich of her shoulder injury and surgery on her front porch/stoop prior to being moved, as well as while she was being moved. Once she was in the prone position, Miller avers that he placed her in two sets of handcuffs due to her having vocalized that she recently had shoulder surgery.

"[A]n officer's otherwise reasonable conduct may be objectively unreasonable when the officer knows of an arrestee's medical problems." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009). For example, in *Stainback*, the Seventh Circuit held that "[h]ad the Officers known of a preexisting injury or medical condition that would have been aggravated by handcuffing Mr. Stainback, or had Mr. Stainback communicated to the Officers that he suffered from such an infirmity, the Officers certainly would have been obligated to consider that information, together with the other relevant circumstances, in determining whether it was appropriate to handcuff Mr. Stainback." *Id.* at 773. In a later-decided case, the Seventh Circuit, applying *Stainback*, held that where a person had informed the arresting officers of a medical condition, and "it was undisputed that [he] was cooperative the entire time," it was not reasonable to "exacerbat[e] [the person's] medical problems . . . by keeping the handcuffs as tight as they were," as such conduct was not necessary to ensure safety. *Rabin v. Flynn*, 725 F.2d 628, 636 (7th Cir. 2013).

Here, while the video footage makes clear that Plaintiff informed Miller, Klemke, and Heinrich of her preexisting shoulder injury prior to movement off her front porch/stoop, she did so while she was physically

resisting arrest. Once she was in the prone position and arguably cooperating, Miller used two sets of handcuffs for protection of Plaintiff's shoulder. The record is clear that the arresting officers considered Plaintiff's shoulder injury, as well as her continued resistance, in determining the appropriate level of force to use, and subsequently considered that she had ceased physically resisting in handcuffing her in a manner designed for her safety. This case is not like *Rabin* where the arresting officer intentionally kept handcuffs tight despite knowledge of a preexisting injury, but rather shows efforts to tailor the use of force, and later handcuffs, to the injury.

Accordingly, considering the totality of the circumstances, Miller, Klemke, and Heinrich's movement of Plaintiff off her front porch/stoop and into the prone position for double handcuffing was objectively reasonable. Alternatively, because the facts do not make out a constitutional violation, and even if they did, case law does not demonstrate that the right to be free from this particular use of force was clearly established on July 22, 2019, Miller, Klemke, and Heinrich are entitled to qualified immunity. In other words, Plaintiff has not met her burden of showing that this conduct was objectively unreasonable in order to defeat Miller's, Klemke's, and Heinrich's assertions of qualified immunity.

### 4.2.5 The County Defendants' Placement of Plaintiff in the Restraint Chair

Plaintiff argues that the County Defendants used excessive force in removing her from the squad car and placing her in the restraint chair, and that her placement in the restraint chair constituted excessive force because she did not pose a threat to anyone. ECF No. 41. She also disputes the length of time that she was placed in the chair. Plaintiff's legal argument is not persuasive, and her factual disputes are unsupported. Even if her factual

disputes were supported, they would not make out an excessive force claim; in other words, the disputes are not "genuine."

Use of a restraint chair is not excessive where the person being restrained had "refused orders to cooperate [and] stand up." *Cibulka v. City of Madison*, 448 F. Supp. 3d 1002, 1024 (W.D. Wis. 2020), *aff'd*, 992 F.3d 633 (7th Cir. 2021). In *Cibulka*, the plaintiff argued that excessive force was used on him when he was forced into a restraint chair in the booking area of a jail. *Id.* In response, the defendants maintained that, when the plaintiff did not cooperate with booking orders, they were forced to hold the plaintiff in a segregation cell until he refused to cooperate. *Id.* When the plaintiff would not move to the segregation cell, he was placed in the restraint chair; "[i]f [the plaintiff] had complied with orders to walk to the segregation cell, a restraint chair would not have been necessary." *Id.* Moreover, the officers had to use force to put the plaintiff in the restraint chair, because the plaintiff "physically resisted being moved to the chair" by "attempt[ing] to hold his body in the booking room chair" and "tensing and twisting his body, moving his arms, and thrusting his hips away from the restraint chair." *Id.* The Court held that the force used was not excessive. Even if it was, the deputies were entitled to qualified immunity because the plaintiff had not "identif[ied] any legal precedent that would have prohibited the deputies from using force to put an uncooperative arrestee into a restraint chair under [these] circumstances." *Id.* at 1025.

So too is the Court's conclusion here. Upon arrival at the Jail, Plaintiff refused to exit the squad car, instead becoming agitated and aggressive, while yelling "Rape" several times. After her initial placement in the restraint chair, Plaintiff continued to yell, curse, and physically resist, despite officers' attempts to calm her down. Indeed, the video shows that

the assistance of numerous officers was required to secure Plaintiff's hands and arms to the restraint chair due to her writhing around. Particularly compelling, the Seventh Circuit has held that

> [w]hen an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force. While . . . it was suggested that rather than seek to enforce orders, it was possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, experience and common sense establish that a prison cannot be operated in such a way.

*Colon v. Schneider*, 899 F.2d 660, 668–69 (7th Cir. 1990).

Plaintiff attaches Jefferson County Sheriff's Office policies and procedures to her motion for summary judgment, which explain that the restraint chair must be used "as a last resort, as a form of physical restraint of any inmate who is temporarily out-of-control," and writes that it was instead used as the first resort. ECF No. 46 at 32. As the Court earlier explained, violations of departmental police policies and practices are not dispositive as to the Fourth Amendment reasonableness analysis. *Scott*, 346 F.3d at 760. Even so, the restraint chair was far from the "first resort." Officers attempted verbal communication prior to removing Plaintiff from the squad car, and after she was initially seated, and thereafter, multiple officers were needed to gain control of her and secure her to the chair.

Plaintiff's proffered factual disputes regarding the length of her time in the restraint chair lead nowhere. Although Plaintiff asserts that she was in the chair for approximately five hours, she has not cited any evidence to challenge the Jail logs showing that she was in the chair for only two hours,

and that she was removed from the chair at that time to use the restroom.[12] *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the 'put up or shut up' moment in a lawsuit,' summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.") *see also Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015) ("The non-moving party's failure to . . . cite to any admissible evidence to support facts presented in response by the non-moving party render the facts presented by the moving party as undisputed."). And Plaintiff would be hard-pressed to do so, given that she testified at her deposition that she has no memory of being released from the restraint chair. ECF No. 37-5 at 95:13–17.

Even if she had cited any such evidence or been in the restraint chair for five hours, five hours is not an unreasonable length of time, particularly with periodic monitoring by medical staff, as Plaintiff had. *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 668 (7th Cir. 2012), *abrogated on other grounds* (holding that, with periodic medical care and considering that force

---

[12]Plaintiff does not argue that she was denied the restroom, only that she did not request it at all and, therefore, was not removed from the chair until 4:00 P.M., instead of at 1:00 P.M. as the log shows. Further, Plaintiff urinated on herself during her arrest, not while in the chair. The Court notes these allegations only to the extent that they may suggest a conditions-of-confinement theory, which the Court concludes they do not. However, even if they did, Plaintiff did not plead any facts or allegations regarding the restroom in her complaint. *Litsinger v. Forest River, Inc.*, 536 F. Supp. 3d 334, 351 (N.D. Ind. 2021) (citing *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 860 (7th Cir. 2017) ("If the new claim changes the complaint's factual theories, the court may construe it as an impermissible attempt to alter the complaint.")).

may be required to *remove* a person from the restraint chair, 18 hours in the restraint chair is not unreasonable).

Accordingly, to the extent any force was used placing Plaintiff in the restraint chair, it was objectively reasonable. Alternatively, as in *Cibulka*, the County Defendants are shielded by qualified immunity, because Plaintiff has not met her burden of identifying authority establishing that her placement in the restraint chair was objectively unreasonable. Further, because the facts do not make out a constitutional violation, and even if they did, case law does not demonstrate that the right to be free from this particular use of force was clearly established on July 22, 2019, the County Defendants are entitled to qualified immunity. As a result, Defendants are entitled to summary judgment on Plaintiff's excessive force claim in its entirety.

### 4.3    Denial of Medical Care Claim

Plaintiff directs her claim that she was denied medical care during her six-hour detention towards Luebke. Specifically, she alleges that Luebke failed to address her injured shoulder, her broken toe, the taser prong left in her abdomen, her swollen wrists from the restraint chair, and her asserted stroke. ECF No. 1 at 4–6; ECF No. 42; ECF No. 46. As a pretrial detainee, the Fourth Amendment's "reasonableness standard" governs Plaintiff's denial of medical care claim. *Ortiz v. City of Chicago*, 656 F.3d 523, 530 (7th Cir. 2011); *Summers v. Standiford*, No. 19 C 2978, 2022 WL 3908673, at *6 (N.D. Ill. Aug. 30, 2022) ("The standard for pretrial detainees is whether the medial professional's treatment was 'objectively unreasonable' and rose to a level beyond negligence or even gross negligence."). In turn,

> Four factors inform our determination of whether an officer's response to [a detainee's] medical needs was objectively

unreasonable: (1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns.

*Ortiz*, 656 F.3d at 530. The detainee "must also show that the defendants' conduct caused the harm of which she complains." *Id.* In addition to these factors, "the relatively short period of time that a detainee spends in lockup is pertinent to the analysis." *Id.* at 531.

The Seventh Circuit has held that the second factor involves an assessment as to whether the plaintiff's medical complaints were accompanied by any physical symptoms. *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007) (citing *Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir 2007)). In *Sides*, for example, while the plaintiff complained of heat stroke, he did not present with any physical symptoms of heat stroke or any symptoms that "implied a need for medical attention." 496 F.3d at 828.

The same is true as to Plaintiff's complaints regarding her toe, wrists, and alleged stroke. The medical logs make clear that Plaintiff's toe was examined, with a note concluding that "toe capillary is good in bilateral feet." ECF No. 37-10 at 3. As to Plaintiff's wrist, the medical logs note that Luebke examined her wrist and observed "no swelling, bruising or redness noted," and additionally took Plaintiff's vitals (despite Plaintiff's initial refusals to have her vitals taken). *Id.* at 1–2. Finally, when Plaintiff claimed that she had a stroke, Luebke examined her for a stroke, noting "good movement with mouth when speaking, no drooping in facial muscles, and eye lids bilateral," and that Plaintiff did not report any numbness other than in her face. *Id.* Luebke also wrote that Plaintiff had "no difficulty walking, no change in cognition, understood all questions asked by nurse, no slurred

speech, no reports of issues seeing, no reported headache." *Id.* Plaintiff also told Luebke that she had never received treatment for strokes and that her last stroke was self-diagnosed. *Id.* When Luebke said that she needed to call her supervising doctor for orders based on this complaint, Plaintiff said she would not see the Jail doctor and wanted her own doctor. *Id.* As to these three injuries, Luebke's conduct represented objectively reasonable professional judgment, particularly given the short time that Plaintiff was detained.

Regarding Plaintiff's complaint that the taser barb was left in her abdomen, there is no evidence in the record that Luebke had notice of this medical need; therefore, the first factor is not met. Plaintiff did not complain about her abdomen during any of her 10 restraint chair checks, nor during her medical evaluations, which took place every 30 minutes as ordered by the Jail doctor. Plaintiff refused to allow Luebke to complete an assessment until 3:59 P.M., when she finally allowed her vitals to be taken and a full examination performed; the examination did not reveal any abdominal complaints or issues. Turning to Plaintiff's left shoulder, the medical logs reflect that Plaintiff complained about her shoulder to Luebke during one medical check-in, but refused to have her vitals taken or an examination done during the same visit, after having refused multiple prior attempts to take her vitals. *Id.*

The Court need not analyze these two complaints in accordance with the four-factor test set forth above, however, because where jail medical staff "made efforts to treat [a detainee], but those efforts were rebuffed," a claim that the medical staff acted objectively unreasonably will not stand. *Estate of Swayzer v. Milwaukee County*, No. 16-CV-1703-BHL, 2022 WL 656884, at *16 (E.D. Wis. Mar. 4, 2022) (medical personnel may conclude

that a detainee with some history of mental health illness is nonetheless competent to refuse medical treatment, and honor that refusal, which is objectively reasonable); *cf. Hahn v. Walsh*, 915 F. Supp. 2d 925, 953 (C.D. Ill. 2013), *aff'd*, 762 F.3d 617 (7th Cir. 2014) ("Plaintiff cannot refuse treatment and food and then complain that defendants were deliberately indifferent to (her) medical and nutritional needs.") (citations omitted).

That is precisely what Plaintiff did here. Although at some point "a refusal of treatment might turn suicidal and require intervention by the jail," Plaintiff received required 30-minute check-ins, each of which involved an attempt to take her vitals and perform an assessment. *Id.* Plaintiff finally permitted a full examination at 3:59 P.M., after Gregg's arrival and assurance that her sister would be called, and approximately 90 minutes prior to her release. Under these circumstances, Luebke's treatment was objectively reasonable. Alternatively, because the facts do not make out a constitutional violation, and even if they did, case law does not demonstrate that the rights Plaintiff asserts were clearly established on July 22, 2019, Luebke is entitled to qualified immunity. In other words, Plaintiff has not met her burden of showing that Luebke's treatment was objectively unreasonable in order to defeat Luebke's assertion of qualified immunity. As a result, the Court will grant summary judgment in favor of Luebke on this claim.

5. **CONCLUSION**

Based on the foregoing, the Court denies Plaintiff's motion for summary judgment, ECF No. 41. The Court grants the County Defendants' motion for summary judgment, ECF No. 38, and Miller's motion for summary judgment, ECF No. 32, as to each of Plaintiff's claims, and will

dismiss this case with prejudice. As a result, the Court denies Plaintiff's motion to quash, ECF No. 62, as moot.

Accordingly,

**IT IS ORDERED** that Plaintiff Pamela J. Hokamp's motion for summary judgment, ECF No. 41, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants Deputy Teri Wegner, Deputy Tom Klemke, Deputy Daniel Heinrich, Deputy Eric Heine, Deputy Scott Yambor, Deputy Matt Kanters, Nurse Amanda Lenz, and Nurse Sarah Luebke's motion for summary judgment, ECF No. 38, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant Chief Matthew Miller's motion for summary judgment, ECF No. 32, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff Pamela J. Hokamp's motion to quash, ECF No. 62, be and the same is hereby **DENIED as moot**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 9th day of January, 2023.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.